Filed 5/29/26  P. v. Siguantay CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>MAYNOR OXLAJ SIGUANTAY,<br>        Defendant and Appellant. | A171289<br><br><br>(Marin County<br>Super. Ct. No. CR0001267) |

This is an appeal from judgment after a jury convicted defendant Maynor Oxlaj Siguantay of second degree robbery, with a special enhancement for personal firearm use (Pen. Code, §§ 211, 120225, subd. (a), 12022.53, subds. (b), (g));[1] possessing a firearm as a felon (§ 29800, subd. (a)(1)); and two counts of obstructing or resisting an officer (§ 69).

Defendant challenges the judgment on grounds that his trial counsel was prejudicially ineffective in failing to object to the admission of testimonial hearsay in violation of the confrontation clause of the Sixth Amendment of the United States Constitution and that section 29800, subdivision (a)(1) is facially unconstitutional under the Second Amendment. We affirm.

---

[1] Unless otherwise stated, all statutory citations herein are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 26, 2024, a criminal information was filed charging defendant with second degree robbery (§ 211; count 1), possessing a firearm as a felon (§ 29800; count 2), and two counts of obstructing or resisting an executive officer (§ 69; counts 3–4). It was further alleged that, in committing the robbery, defendant personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b), (g)).

A jury trial revealed the following evidence. On November 23, 2023, around 7 p.m., the victim, Ernesto V., left home to run an errand. He came across two male acquaintances outside a restaurant on Tamalpais Avenue in San Rafael. As the three men chatted, defendant approached them from the direction of a liquor store next to the restaurant. Defendant pointed a gun at the men and demanded their money. Ernesto, who was afraid, handed defendant $175 in cash. Defendant, before fleeing, warned the men, " 'I don't want to see you here anymore because I'll be back.' "

After debating with his acquaintances what to do, Ernesto eventually contacted the police 20 or so minutes later. Since he did not have a phone, Ernesto entered the liquor store and asked an employee to call the police. The employee, who believed Ernesto had been drinking, called 911 and passed along Ernesto's description of the robber: a Latino male; 25 to 35 years old; with "cutted [*sic*]" jeans, a black jacket, buzz-cut hair and a tattoo over his right eye.

Police Officer Casey Debolt responded to the scene and spoke to Ernesto. The officer suspected Ernesto was drunk, although Ernesto said he had just two beers at lunch. Officer Debolt was also concerned about inconsistencies in Ernesto's statements. For example, Ernesto initially stated that he " 'just gave him the money' " and later stated the robber

2

demanded the money.  Officer Debolt also found it strange that Ernesto described the robber's gun as "yellow," which was not a typical firearm color.

About two hours later, a mile or so from the robbery scene, Officer Debolt saw defendant walking with a woman pushing a small child in a stroller.  Similar to Ernesto's description, defendant had a "buzzed bald haircut" and was wearing ripped jeans and a black jacket.  He also had a tattoo, but it was over his left eye rather than his right eye.  When Officer Debolt and another officer called out to defendant, he walked away and grabbed his waistband.  The officers, concerned for their safety, handcuffed and searched defendant.  They found a firearm in defendant's waistband that was black with "almost like a gold color" barrel.  However, they did not find any money on defendant.  After the officers placed defendant in a seated position on the curb, he became angry and started yelling.  He directed several expletives and threats toward the officers.  Among other things, defendant told Officer Debolt, " 'I'm going to smoke your ass.' "  Then, after defendant was placed in the police vehicle, he kicked another officer near his face.

A police officer called Ernesto and asked him to participate in an infield identification.  Ernesto was reluctant, first refusing, but then agreeing, to participate.  Once he arrived, Ernesto told officers he was " 'afraid' " to approach defendant.  Defendant, in turn, refused commands to look in Ernesto's direction.  Ernesto, from about 20 feet away, told officers, who were shining a flashlight on defendant, " 'It's not him.' "  Ernesto also told the officers the robber had longer hair.

Later that evening, about 11:30 p.m., Officer Genesis Ortiz was dispatched to the Marin County Jail to follow up on a report that an inmate named Jose C. recognized defendant, who was also an inmate, from "a prior

3

incident in the night." Jose, who appeared intoxicated, told Officer Ortiz that he saw defendant "hours earlier" in front of the liquor store where Ernesto was robbed. Jose was standing with a few friends when defendant approached them and said, " 'I feel like I know you,' " while lifting his shirt to display a firearm in his waistband. Jose told Officer Ortiz that defendant never removed the firearm from his waistband; nor did he rob them.

At trial, Ernesto described the robber much the same as he did on the night in question. He stated the robber was Latino, bald but with some hair, and with a tattoo over his eye. Ernesto also recalled the robber's having a yellow and silver gun. Ernesto first testified that the robber wore a black shirt but later testified his shirt was white. Ernesto also testified the tattoo was over the robber's right eye. However, he also acknowledged being unsure whether the tattoo was over the robber's right or left eye.

The jury viewed police officers' body camera footage. This footage showed defendant, a Latino with buzz-cut hair, in distressed jeans with a shirt that was black on the bottom and white on the top. He had a tattoo over his left eye.

Similarly, video footage from the liquor store's security camera on the evening of the robbery showed a man with buzz-cut hair walking by the store, with distressed jeans, a shirt that was black on the bottom and white on the top, and a black jacket.

Lastly, video footage from a nearby train station, timestamped a few minutes after 6:00 p.m. on the evening of the robbery, showed defendant walking past the liquor store. Defendant was dressed in a shirt that was black on bottom and white on top. Although defendant was partially obstructed in the video, he appeared to remain in the same spot in front of the restaurant beside the liquor store for about two minutes. At that point,

4

defendant walked around the corner of the restaurant and broke into a run after a car passed.

A jury convicted defendant on all counts and found true the firearm allegation. On July 18, 2024, the trial court sentenced defendant for these crimes, as well as for the crime of false imprisonment in violation of section 236 in another case. Defendant's aggregate prison term amounted to 14 years 4 months.

On August 12, 2024, defendant filed a timely notice of appeal.

## DISCUSSION

Defendant contends on appeal (1) his robbery conviction (count 1) must be reversed because his counsel rendered ineffective performance by failing to object to inadmissible testimonial hearsay as violating the confrontation clause of the Sixth Amendment and (2) his conviction for being a felon in possession of a firearm under section 29800, subdivision (a)(1) (count 2) must be reversed because the statute is facially unconstitutional under the Second Amendment. We address each issue in turn *post*.

## I.     *Effectiveness of Assistance from Trial Counsel.*

Defendant contends his trial counsel rendered ineffective assistance in failing to raise a hearsay objection to the admission of statements made by a jail inmate, Jose C., to Officer Ortiz regarding defendant's presence at the crime scene with a firearm in his waistband. At trial, Jose invoked his Fifth Amendment rights and declined to testify. Thus, because Jose was unavailable at trial, any statements he made out of court would have been inadmissible hearsay. (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177] ["Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine"].) According to

5

defendant, counsel's failure to raise a hearsay objection to Jose's statements gifted to the prosecution "the best evidence connecting [him] both to the scene of the robbery and the gun"—a decision "patently unreasonable" and highly prejudicial.

"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674]; [citation].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington, supra*, at p. 687; [citation].)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *People v. Cromer* (2001) 24 Cal.4th 889, 899–902 [ineffective assistance claim raised mixed question of law and fact reviewed independently on appeal].)

Defendant has not met this high standard because he has not met his burden of proving reasonably competent counsel would not have allowed Jose's statements into evidence. To the contrary, the record reflects that, when the issue of Jose's out-of-court statements to Officer Ortiz was raised at trial, the trial court stated, "I'm going to take a wild guess that there's going to be a hearsay objection to that testimony?" Defense counsel responded, "No, because [Jose] says there's no robbery. Nothing was taken. He didn't pull out the gun. He just kind of showed it like this, or whoever was there, just kind of showed it like this, and that was that." This colloquy reflects

6

that counsel had a clear strategy with respect to Jose's testimony—to use the evidence to show that, even if defendant were present outside the liquor store on the evening in question and carrying a firearm, he did not commit a robbery.

While defendant may, in hindsight, question this strategy, he cannot prove it was objectively unreasonable. Officer Debolt testified that, when he interviewed the victim, Ernesto V., shortly after the robbery, Ernesto gave inconsistent accounts of what transpired. Ernesto, who appeared intoxicated, first stated that he handed the robber money, then later said the robber demanded it. In addition, Ernesto waited over 20 minutes before calling the police. Finally, when officers later detained defendant, they found no money on him. Thus, defense counsel may have sought to use statements from both Ernesto and Jose to argue that defendant may have been present at the alleged crime scene at some point that evening and may have been armed but did not commit a robbery.

In so concluding, we agree with defendant that Jose's statements were incriminating because they placed defendant directly at the scene, armed with a weapon, at the time of the robbery. However, based on the record as a whole, defense counsel may have recognized that there was a wealth of evidence, aside from Jose's statements, that placed defendant at the crime scene with a firearm. As such, counsel may have reasonably decided to rely on the defense that defendant did not commit a robbery rather than the defense that defendant was not present at the scene or armed. For example, Ernesto accurately described defendant as a Latino male between 25 and 35 years old; with buzz-cut hair; and wearing distressed jeans, a shirt that was partially white and partially black, and a black jacket. Ernesto also accurately described defendant as having a tattoo over one eye and a firearm

7

that was partially gold or yellow in color. Moreover, video footage from three independent sources—the police officers' body cameras, the liquor store's security camera, and a nearby train station's security camera—corroborated these facts regarding defendant's appearance. Under these circumstances, we cannot conclude counsel's performance fell outside the broad range of professional competence. As the California Supreme Court advises, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) This is not one of those rare cases.

Finally, defendant insists "a finding of deficient performance is 'inescapable' here because counsel made clear he believed that Jose's testimonial hearsay statements were admissible due to his unavailability . . . ." His claim fails. Even assuming defendant were correct (in fact, the record is ambiguous as to counsel's beliefs), the relevant standard would require us to consider whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, not whether counsel had the requisite knowledge regarding the admissibility of the evidence. (*Strickland v. Washington, supra*, 466 U.S. at p. 694.) Thus, defendant's ineffective assistance claim fails.

## II.   *Constitutionality of Section 29800, Subdivision (a)(1).*

Defendant was convicted in count 2 of being a felon in possession of a firearm. (§ 29800, subd. (a)(1).) Section 29800, subdivision (a)(1) provides, in relevant part: "Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." Defendant contends this statute is facially unconstitutional under the Second Amendment of the federal Constitution. We disagree.

8

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) Whether a firearm prohibition violates the Second Amendment on its face raises a constitutional issue reviewed de novo on appeal. (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799–801.) We " 'presume [the] statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 696.) Moreover, because defendant raises a facial challenge, he must prove the statute poses a " ' "total and fatal conflict with [the Second Amendment]," ' " meaning that " ' "no set of circumstances exists under which the [statute] would be valid" . . . .' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084; *In re D.L.* (2023) 93 Cal.App.5th 144, 157; see *People v. Crenshaw* (2025) 116 Cal.App.5th 1169, 1174 [a defendant challenging a statute's constitutionality " ' "carries a heavy burden" ' "].) He cannot do so.

Our colleagues in the First Appellate District, Division Three, recently addressed the precise issue raised herein—whether section 29800, subdivision (a)(1), on its face, violates the Second Amendment. In *People v. Anderson* (2024) 104 Cal.App.5th 577 (*Anderson*), following an exhaustive inquiry, our colleagues held that section 29800, subdivision (a)(1) does not run afoul of the Second Amendment. (*Anderson*, at p. 589.) We agree. And, while we need not rehash the *Anderson* court's detailed analysis, we briefly identify its key points.

The *Anderson* court began by examining recent United States Supreme Court case law addressing the scope of the Second Amendment, albeit without cause to consider the precise issue at hand—the constitutionality of

statutes prohibiting felons from possessing firearms. (*Anderson, supra*, 104 Cal.App.5th at pp. 584–586.)

First, in *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637], the high court held that while based on "both text and history, that the Second Amendment confer[s] an individual right to keep and bear arms," this right should not be understood as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at pp. 595, 626.) In particular, the court added that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which are "presumptively lawful regulatory measures." (*Id.* at pp. 626–627 & fn. 26.)

Next, in *N.Y. State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 [213 L.Ed.2d 387] (*Bruen*), the court set forth a two-part framework for deciding Second Amendment challenges: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, at p. 17.) The court clarified, however, that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. . . . [It] requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation

is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id.* at p. 30.)

Lastly, and more recently, in *United States v. Rahimi* (2024) 602 U.S. 680 (*Rahimi*), the court upheld the constitutionality of a federal statute prohibiting a person from possessing a firearm when he or she is subject to a domestic violence restraining order and deemed to pose a clear threat of physical violence to another. The court explained that its "precedents were not meant to suggest a law trapped in amber" and that courts must ascertain whether the new law is " 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " (*Rahimi, supra*, at pp. 691, 692.) In doing so, the court reiterated the statement in *Heller* that "many [regulatory] prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful [under the Second Amendment].' " (*Rahimi, supra*, at p. 699.)

The *Anderson* court recognized this United States Supreme Court authority as controlling and undertook the requisite legal and historical analysis. Based on its analysis, the court held that, while the Second Amendment presumptively protects the defendant's right to possess a loaded firearm notwithstanding his status as a felon, "sources from 17th-century England, colonial America, and the early federal period demonstrate that California's felon-in-possession firearm regulations comport with our national tradition of firearm regulation." (*Anderson, supra*, 104 Cal.App.5th at pp. 588–589.) The court explained that in this historical tradition, "categories of persons thought to pose a danger to the community were forbidden to have arms, and individuals were sometimes disarmed as a consequence of being convicted of criminal conduct. When the founding generation framed and

11

debated constitutional text, it considered such limitations inherent in the right the Second Amendment protects." (*Ibid*.) Accordingly, the court held that "this nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony." (*Id*. at p. 599.)

We find no reason to stray from the reasoning of our *Anderson* colleagues. As such, we adopt it herein in rejecting defendant's Second Amendment challenge. In doing so, we reiterate a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.' " (*Rahimi, supra*, 602 U.S. at p. 693.) Thus, since defendant raises a facial challenge, " 'to prevail, the Government need only demonstrate that [the statute] is constitutional in some of its applications.' (*Rahimi*, at p. 693 [144 S.Ct. at p. 1899].)" (*Anderson, supra*, 104 Cal.App.5th at p. 600.) Here, as in *Anderson*, section 29800, subdivision (a)(1) is " 'constitutional as applied to the facts of [defendant's] own case.' " (*Anderson*, at p. 600.) Defendant was sentenced in this case simultaneously with another criminal case, Marin County Superior Court case No. SC220927. In the latter case, he pleaded guilty to a felony count of false imprisonment by violence (§ 236), as well as misdemeanor counts of drawing or exhibiting a firearm (§ 417) and obstructing or resisting a police officer (§ 148). In addition, the court found him in this case to have been in violation of the grant of probation in case No. SC220927. Under these circumstances, we may confidently conclude that, "in the founding era, he could have been disarmed as punishment for at least one of these crimes." (*Anderson, supra*, at p. 600.)

## DISPOSITION

The judgment is affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Chou, J.